# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MAUREEN McCARRAGHER, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 14 C 08591 |
| CHRISTOPHER DITTON, individually and in his official capacity as AVON TOWNSHIP ASSESSOR, | ) ) ) ) ) ) | Judge John J. Tharp, Jr. |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Maureen McCarragher, a former employee of the Avon Township Assessor's Office[1] brings this action against Christopher Ditton, the elected Avon Township Assessor. McCarragher alleges that, in violation of her First Amendment rights, Ditton punished her for not supporting him politically when he retained his unqualified patronage hires while the office's funding ran out, and then, after terminating everyone for lack of funds, failed to hire her for a new position when he later re-hired his political allies. McCarragher also alleges that the failure to rehire her was retaliation for the filing of this lawsuit (the rehiring occurred between the original and amended complaints). Before the Court is Ditton's motion to dismiss the amended complaint for failure to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed below, the motion is denied.

---

[1] Avon township comprises the communities of Round Lake, Grayslake, Hainesville, and Third Lake in Lake County, Illinois.

**FACTS**

The factual allegations in the plaintiff's amended complaint, *see* ECF No. 30, are assumed to be true for purposes of this motion to dismiss. *See Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 982 (7th Cir. 2013).

In January 2010, McCarragher, a Certified Illinois Assessor Officer ("CIAO") was hired as a deputy assessor by Christopher Ditton's predecessor as Township Assessor, Bryce Carus. Carus was elected in 2009 as part of the "Avon Forward" slate of candidates, which also included defendant Ditton, who ran for Township Trustee, Tom Brust, the candidate for Highway Commissioner, and Sam Yingling, who ran for Township Supervisor. These candidates and political allies all won, except for Tom Brust, but he quickly obtained the Highway Commissioner post anyway, because the Commissioner resigned and Yingling appointed Brust to fill the vacancy.

Carus took office as Assessor in January 2010, and hired McCarragher, an experienced assessor. Possibly at Yingling's insistence, he also hired Cynthia Brust, Tom's wife, although she had no qualifications and was not a CIAO. Carus fired Cynthia Brust within two months. In June 2011, Carus resigned as Assessor. In December 2011, Ditton was appointed to serve the remainder of Carus's term, although he had no experience and had to start from scratch taking classes to become an assessor. At that time, only McCarragher and one other employee of the Assessor's Office (Robin Vidone-O'Donnell) were qualified as Deputy Assessors under state law. In April 2013, Ditton was elected to continue as the Avon Township Assessor. McCarragher did not support Ditton in his campaign, nor had she supported his earlier political campaigns.

As a Deputy Assessor, McCarragher did not supervise any employees and could not make any hiring or firing decisions. She did not make policy, and believed that she lacked

authority to do so. Instead, she was "duty-bound to follow state statutes in the performance of [her] job function," to the extent that the Illinois Code addresses the position of deputy township assessors at all. No statute or ordinance defines a township deputy assessor's role as anything but "evaluat[ing] and assess[ing] property," and the township deputy assessor is not a department head and does not manage the budget, supervise employees, or make policy. McCarragher was not authorized to fill in for Ditton in his absence. On the other hand, as the Township Assessor, Ditton had the authority to hire and fire employees, oversee the budget, and set policy.

For the budget year 2014, the Township Board approved enough funding for the Assessor's office for its existing two deputies (including McCarragher), although Ditton had requested funding for four. Despite the lack of budget authorization, he nevertheless hired two additional employees—Cynthia Brust and Richard Watts, another of his political allies— although they were not certified assessors. (Indeed, Ditton unsuccessfully sought an injunction in federal court to get sufficient funds to make his patronage hires.) The Avon Township Board warned Ditton that budgetary constraints would not allow him to retain all of his employees in the 2014 budget year. Nevertheless, rather than stretch the budget by laying off his two most recent hires, who lacked experience or qualifications as deputy assessors, Ditton retained Brust and Watts, thereby depleting the budget of funds sufficient to maintain McCarragher's position for the balance of the year. To make matters worse, McCarragher alleges, Ditton paid Brust for full-time work although she had another job during the same working hours. The money ran out six months into the fiscal year, and all of the Assessor's Office employees, including McCarragher, were laid off. McCarragher's termination was effective on September 25, 2014— two weeks after Ditton's preliminary injunction regarding funding was denied. If Ditton had

3

heeded the warnings that he could not afford four deputies, there would have been funding for McCarragher's job for the entire fiscal year.

On October 30, 2014, McCarragher filed her first federal complaint pursuant to 42 U.S.C. § 1983, asserting that her termination was the result of her failure to support Ditton politically, in violation of her First Amendment rights. She also alleged a violation of her right to due process under the Fourteenth Amendment. Ditton moved to dismiss the complaint, but that fully briefed motion became moot when McCarragher was granted leave to amend her complaint.

The First Amended Complaint retains the claim that Ditton's patronage appointments caused the funding crisis that necessitated McCarragher's termination. McCarragher now adds a claim that filing this lawsuit prompted further retaliation, in that Ditton, once funding returned in February 2015, recalled his patronage hires but not McCarragher, and gave an open position of part-time assessor to his campaign manager's sister instead of offering McCarragher that position. McCarragher no longer pursues a due-process claim. She seeks compensatory and punitive damages and a permanent injunction restoring her job, seniority, salary, and benefits and prohibiting patronage-based personnel decisions in the Assessor's office in the future. Once again, Ditton moves to dismiss the amended complaint in full.

## DISCUSSION

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555–56. The plaintiff "must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010). In resolving the motion, the Court

takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to a presumption of truth. *Virnich v. Vorwald,* 664 F.3d 206, 212 (7th Cir. 2011).

I. **First Amendment Claims**

In Count I, McCarragher alleges that political favoritism motivated both the decision to lay her off (because the patronage hires should never have been made and those employees should have been the first to go) and not to give her a job when positions became available again. In Count II, she alleges that Ditton's failure to hire her for an open position when he recalled his patronage hires was retaliation for exercising her First Amendment right to file this lawsuit on a matter of public concern.

a. **Patronage Claim: Unlawful termination and failure to rehire**

Ditton contends that McCarragher's First Amendment patronage claims fail as a matter of law because party affiliation and loyalty are appropriate requirements for the job of Deputy Assessor in Avon Township. *See* Mem. 10- 13, ECF No. 32. McCarragher argues that the patronage hiring and recall decisions[2] in this case were unlawful violations of her free association rights under the First Amendment, and that her position is not exempt from the patronage rules because it is not a policymaking job.

"[P]atronage is a very effective impediment to the associational and speech freedoms which are essential to a meaningful system of democratic government," stated the Supreme Court in *Elrod v. Burns*, 427 U.S. 347, 369-70 (1976), the first in a line of cases holding that "the practice of patronage dismissals is unconstitutional under the First and Fourteenth

---

[2] Count I of the complaint focuses on the layoff, not the recall, but the patronage rules apply to both actions equally, *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990), and McCarragher's response brief addresses both actions in the context of her patronage claim.

Amendments," *id.* at 373. *See also Branti v. Finkel*, 445 U.S. 507, 517(1980) (explaining that "there is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance" and "it was sufficient, as *Elrod* holds, for respondents to prove that they were discharged 'solely for the reason that they were not affiliated with or sponsored by'" a particular political party); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990) ("We therefore determine that promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees."). The rules against patronage in public employment were expanded most recently in *Heffernan v. City of Paterson*, 136 S. Ct. 1412 (2016), in which the Supreme Court held that a personnel decision premised on an incorrect belief about a person's political allegiance violates the First Amendment, even though no actual protected political activity had occurred. *See id.* at 1416, 1419.

The exception to the prohibition on political hiring is when the job in question is one for which political affiliation is a legitimate requirement—a so-called "policymaking" position. *Elrod*, 427 U.S. at 367-68. The "government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views." *Rutan*, 497 U.S. at 74. "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. The job must entail a "heightened need for trust and confidence that ... subordinates are guided by the same political compass and will exercise their discretion in a manner consistent with their shared political agenda." *Bonds v. Milwaukee Cnty.*, 207 F.3d 969, 977 (7th Cir. 2000).

Here, McCarragher alleges that she was terminated and not rehired merely because she had not supported the Assessor's political campaigns. This is a straightforward patronage-hiring claim, although the parties' briefs muddy the applicable doctrine somewhat. "*Elrod–Branti* applies when the public speech is nothing more than public political affiliation." *Embry v. City of Calumet City, Ill.*, 701 F.3d 231, 235 (7th Cir. 2012).

Ditton argues that the nature of McCarragher's position was such that the exception for policy-makers applies and defeats her claim as a matter of law. The Seventh Circuit interprets the policymaker exception as clarified in *Branti* as a mandate to "examine the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir. 1985). The courts must look to whether an employee's position "inherently encompasses tasks that render her political affiliation an appropriate prerequisite for effective performance." *Id*. "[A]n employee's position is unprotected if, first, there is room for principled disagreement in the decisions reached by the employee and [her] superiors, and, second, [she] has meaningful direct or indirect input into the decision-making process." *Id*. (quoting *Nekolony v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981)).[3]

Ditton seizes on the "inherent powers" language and insists that this Court should hold as a matter of law that a Township Deputy Assessor is a policymaking position involving influence

---

[3] This Court heartily agrees that "it is often difficult to determine whether an individual has policymaking responsibilities." *Davis v. Ockomon*, 668 F.3d 473, 477 (7th Cir. 2012). There is considerable tension between the "inherent powers" test and the requirement to assess whether there is room for "principled disagreement" and "meaningful input . . . into the decision-making process." It is not clear to this Court that the latter questions can be answered by reference to a job description or the statute defining a government position. Instead, they would seem to depend on the circumstances of a particular office environment, supervisor, etc. But the "inherent powers" rule is meant to "relieve the courts of the burden of having to examine a certain position every time new administration changes the mix of responsibilities bestowed upon the officeholder" and "provide certainty." *Tomczak*, 765 F.2d at 642. Therefore, under *Tomczak*, an employee can lose First Amendment protection based on the theoretical, rather than the actual, responsibilities of her job.

over policy and decision-making. He bases this argument on Illinois statutes and (primarily) three cases. McCarragher counters that, beyond the fact she performed none of the policymaking functions that underlie the exception, as a general matter no statute prescribes any policymaking authority for a deputy township assessor and that Ditton relies on inapt authority.

Beginning with Ditton's statutory argument, it is appropriate to focus the "inherent powers inquiry" on the "statute or ordinance establishing a position's duties," and any job description that elaborates on, but does not contradict, those definitions. *Davis v. Ockomon*, 668 F.3d 473, 478 (7th Cir. 2012). Chapter 200, Article 2 of the Illinois Code addresses the position of "Township Assessment Official" and is primarily directed at the elected Township Assessor.[4] 35 ILCS 200/2-30 empowers the Township Assessor to prepare and submit a proposed budget to the Township Board. Section 2-45 prescribes the minimum qualifications for candidates for elected Township Assessor positions. If the position of Township Assessor becomes vacant, a deputy does not succeed the Assessor; instead, the Township Board appoints "a member of the same political party as the person vacating the office" if such a qualified person is available; otherwise any qualified assessor may be appointed. 35 ILCS 200/2-60.

The position of deputy township assessor is defined in the Property Tax Code. 35 ILCS 200/2-65(a) employers the Township Assessor to "appoint one or more suitable persons as deputies *to assist in making the assessment*." In turn the Property Tax Code defines "Assessor"

---

[4] There is an Illinois statute that addresses deputy assessors in *counties* of more than 3 million people—of which Lake County is not one. That is Title 3 of Section 200, and under the rules (which apply only to Cook County), the Assessor must appoint a chief deputy, a deputy in charge of administrative services, and a deputy in charge of real estate. 35 ILCS 200/3-55. Any other deputies may be hired "under the civil service law" applicable in the County. McCarragher argues that, to the extent any analogy can be made between Cook County and a small township, she is akin to a "civil service" deputy and not one of the chief deputies appointed outside the civil service laws. The Court agrees. *See* p. 11, *infra*.

to include "county, township, multi-township or deputy assessors, **all of whom evaluate and appraise property**." Thus, under Illinois law, the Assessor and the deputy assessors both are empowered to evaluate and appraise—*i.e.*, assess—property.

So, to the extent that the Illinois Code sheds light on the "inherent powers" of a deputy assessor, they overlap with the powers of the elected Township Assessor only as to the authority to perform assessments. Deputies are not even necessary in a Township Assessor's office and are only appointed as needed to make the property assessments in a timely manner; there is no subordinate type of "assessor" below "deputy"; rather, "deputy" merely indicates subordination to the elected Assessor. To fill in the gaps the statute leaves with respect to township deputy assessors, Ditton emphasizes McCarragher's CAIO certification, one result of which is her *qualification* to be an Assessor if she were to run for the position. *See* Def. Mem. 13, ECF No. 32. But that is beside the point. She had the qualifications to run for Assessor, but she was *not* the Assessor, she was a deputy (township—not County—deputy), and the Court must look to the inherent functions of *that* job. Nothing in Illinois law points to that position having any policy making function or the ability to have "meaningful input" into discretionary decisions. The only statute addressing the deputies simply authorizes them to perform property assessments; therefore, statutory law does not answer the question posed by Ditton's motion.

Ditton also trumpets three cases as support for the proposition that, as a matter of law, a deputy Township Assessor is a job for which political allegiance is a valid requirement. One is supplemental authority that is directly on point, although not binding. In *Hanson v. Milton Township*, 177 F. Supp. 3d 1096 (N.D. Ill. 2016), another court in this District concluded that a deputy township assessor in Illinois has policymaking authority for purposes of the patronage-dismissal laws. With due respect, this Court does not agree with the *Hanson* Court. By citing

9

only provisions of Article 3, the *Hanson* Court appeared to rely on statutes governing county assessors, not township assessors (see n.3, *supra*), in addition to a 1929 Illinois Supreme Court case, *People ex rel. Cutmore v. Harding*, 333 Ill. 384, 395, 164 N.E. 827, 831 (1929), that addressed duties of members of the board of Cook County assessors and their deputies. In that case, the Supreme Court concluded that the act of viewing and determining the value of property is not "clerical" and not "the mere gathering and recording of information." *Id*. at 395.

This Court does not take issue with the general premise of *Cutmore* that a deputy township assessor's duties—making property assessments—involve some measure of discretion and judgment in their execution, even if the method of assessing property is formulaic. It is not clerical work. But that is not the question posed by the policy-making exception. The question is not whether the job itself involves *any* discretionary decisions such as how to value a property; it is whether the employee can make discretionary *policy* decisions—whether she "acts as an adviser or formulates plans for the implementation of broad goals" as an inherent part of the job, *see Elrod*, 427 U.S. at 368, such that political affiliation is an "appropriate requirement" for effective performance of that job, *see Branti*, 445 U.S. at 518. There must be a legitimate reason that the employee must be "guided by the same political compass and will exercise [her] discretion in a manner consistent with [a] shared political agenda." *Bonds*, 207 F.3d at 977. Whether an assessor's job involves discretion in valuing property is not the same question as whether the job entails discretion over policy-making; Ditton has not argued that the two are one in the same, *i.e.*, that valuation of property is itself a political or policy-oriented act.

Further, this Court does not agree with the *Hanson* Court's interpretation of the laws applicable to county assessors, even if they were applicable or analogous to the township jobs at issue here. For example, citing 35 ILCS 200/3-55, the *Hanson* Court stated that "deputy

10

assessors not in Cook County are not subject to civil service regulations"; that statute, however, states only that the three required principal deputies (the chief deputy and two divisional deputies) in Cook County are not subject to the civil service rules, but that all other deputies are. The deputy township assessors in Avon Township are not akin to the high-level chief deputies appointed by the Cook County Assessor (at least not as far as the pleadings show), and the exemption from civil service rules for line deputy assessors in Cook County supports the view that such positions should not be characterized as policy-making positions.

This Court also takes issue with the application of *Kline v. Hughes*, 131 F.3d 708 (7th Cir.1997) by the *Hanson* Court and by Ditton (who relies heavily on that case). In *Kline*, the Seventh Circuit held, on summary judgment, that deputy auditors in Spencer County, Indiana, were subject to the policy-maker exception and could be fired for political reasons. Political affiliation was an "appropriate requirement" for the job because the Indiana statutory scheme provided that "a deputy county auditor may perform all the official duties of the county auditor" and the county auditor "is responsible for all the official acts of the deputy." *Id*. at 710. "***This arrangement*** makes clear that the office of deputy auditor plays a vital role in the implementation of the county auditor's policies." *Id*. (emphasis added). Ditton points to no such "arrangement" under Illinois law. Indeed, the statutory scheme suggests the opposite scenario: that *only* the Township Assessor may hire and fire, prepare the budget, or perform any function besides making assessments. And even if the Township Assessor slot is vacated, no deputy takes over his or her responsibilities, even temporarily; instead, another political appointment must be made. Thus the deputies cannot "perform all the duties" of the elected Assessor, even if they are qualified by their experience and certifications do so.

For similar reasons, the Court is also unpersuaded by Ditton's heavy reliance on *Kelley v. Davis*, No. 11 C 331, 2013 WL 5486742 (S.D. Ind. Sep. 30, 2013),[5] another summary-judgment case about a County Assessor's Office (in Madison County, Indiana). There, the district court concluded that the statutory authority of the deputy county assessors "carrie[d] an inherent opportunity to provide meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals and their implementation." *Id.* at * 5. "[T]he job as it is defined in the Indiana Code [is] not a lowly, ministerial discretion-less one. The deputy county assessor plays a vital role in the implementation of the county assessor's policy."

The case is distinguishable. Most importantly, a completely different statutory scheme operates in Indiana: there, a deputy *county* assessor, like the auditors in *Kline*, "may perform all the official duties of the officer who appointed him." *Id.* at * 5. Although McCarragher concedes that the elected Avon Township Assessor is a policy-maker (Pl. Mem. 9, ECF No. 38), this Court has already noted that Ditton cites no Illinois law to the effect that a township deputy assessor can perform the Assessor's duties such as preparing a budget or hiring and firing staff, *even in the absence of the Assessor*. Ditton can only point to McCarragher's CAIO certification, which is a statement of McCarragher's qualifications, not a description of the job of deputy township assessor, and of course, it is specific to the plaintiff—despite Ditton's constant refrain the Court can look only to the position itself, not a particular occupant.

This Court also questions what exactly the *Kelley* and *Hanson* Courts mean when they say the deputies advanced "the county's assessor's policies," and what Ditton means when he

---

[5] However, the Court certainly agrees with Judge Barker's vivid description of the "small town drama" of patronage hiring as akin to "a B-Movie replete with nepotism in governmental hiring, feuding ex-sisters in law, old grudges, 'wine-induced' emails, and shifting political allegiances and alliances." *Id.* at *4. Though distinguishable in the details, the local politics of Avon Township (which have spawned multiple federal lawsuits besides this one) appear to be equally melodramatic.

says that a deputy township assessor has meaningful input into the Assessor's policy agenda. Any assessor assigns value to property and reviews appeals from property owners. That job involves discretion in applying the formulas for making assessments, but it is not clear what policy goals or political agenda[6] the Assessor's office is tasked with or has influence over. No one ever says. Without knowing what the policymaking role even of the elected Assessor are, this Court cannot conclude on the pleadings that an Avon Township deputy assessor is, as a matter of law, inherently empowered to have meaningful input in discretionary governmental decision-making or authority over policy. And unless Ditton's argument is that politics plays a legitimate role in the process of assessing the value of a home or other real property, the Court cannot conclude that a deputy assessor—whose duties are apparently limited to making such valuations—fulfills a policy-making role in which political affiliation is a relevant consideration.

Finally, the First Amendment is a powerful and fundamental protection, and for that reason there is a "presumptive prohibition on infringement" when a patronage personnel decision is made. *Elrod*, 427 U.S. at 360. Therefore, "exacting scrutiny" must be applied before such decisions will be sanctioned. *Id*. at 362. "[I]f conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Id*. at 363; *see Branti,* 445 U.S. at 515-16 (a person's "beliefs cannot be the sole basis for

---

[6] Of course, the Court can imagine plenty of ***unlawful*** political goals of an assessor, such as the manipulation of property values in exchange for bribes. *See, e.g., United States v. Hawkin*s, 777 F.3d 880, 881 (7th Cir. 2015) ("Haleem paid Hawkins and Racasi to arrange for lower assessments. They took his money, and the assessments were reduced, except for one parcel about which the protest was untimely"). But surely the willingness to advance a corrupt agenda through one's official position is not the type of "inherent power" of office that the Supreme Court had in mind when carving out a policymaking exception.

13

depriving him of continued public employement" "unless the government can demonstrate" an overriding interest of vital importance); *Rutan*, 497 U.S. at 74 ("Unless these patronage practices are narrowly tailored to further vital government interests, we must conclude that they impermissibly encroach on First Amendment freedoms."). This is a very high bar, and one that is particularly difficult to clear at the pleadings stage.

"The question of whether a position is exempted from the First Amendment patronage dismissal ban is a factual one that should ordinarily be left for a jury to determine" unless "the duties and responsibilities of a particular position are ***clearly*** outlined by law" *Pleva v. Norquist*, 195 F.3d 905, 912 (7th Cir. 1999) (emphasis added). There is no such clarity here. Absent a job description, statute, or ordinance setting forth powers of a township deputy assessor that amount to meaningful ability to make and implement policy, this Court has no basis to contradict the allegations in the complaint that McCarragher's job was to assess property according her training and the applicable formulas. Because the *Elrod-Branti* line of cases does not restrict an official from engaging in a "good-faith reorganization of an office," *Mitchell*, 215 F.3d 753, Ditton's defense might ultimately prevail, with evidence that deputy assessors in small townships are inherently empowered to influence some (as yet unidentified) policy or give meaningful input into governmental decision-making on debatable issues. But he has not established as a matter of law that McCarragher's position carried the inherent power to influence policy.

### b. First Amendment Retaliation for Filing Lawsuit

The Court has already concluded that Ditton's failure to rehire McCarragher when funding was restored and new positions became available plausibly states a First Amendment claim based up a patronage dismissal theory. Count II also alleges that Ditton did not recall McCarragher in retaliation for the filing of the original complaint in this case on October 30,

2014. Ditton primarily argues that the allegations underlying Count II fail to state a plausible claim for relief because she does not allege that McCarragher's political allegiances caused his personnel decisions.

The elements of a First Amendment retaliation claims are that (1) the plaintiff engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter First Amendment-protected activity in the future; and (3) the plaintiff's protected was at least a motivating factor in the defendant's decision to take retaliatory action. *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017); *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013). The only element that Ditton challenges in his motion is the third. He contends that there was no suspicious timing indicative of a causal link and that McCarragher "failed to plead that she would have been re-hired for her position in the Assessor's Office if she had not filed her complaint." Mem. 9-10, ECF No. 32.

Ditton's arguments miss the mark. First, causation is generally "a factual matter" that is "best answered by the traditional finder of fact." *Volkman v. Ryker*, 736 F.3d 1084, 1089 (7th Cir. 2013). Second, he is wrong that McCarragher was required to plead that "she would have been re-hired for her position in the Assessor's Office if she had not filed her lawsuit." The lawsuit must have been a "motivating factor," which means a sufficient, but not necessary, condition. *Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013); *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011) ("[T]o satisfy his burden of production on the issue of causation by showing that a violation of his rights was a sufficient condition of the harm for which he seeks redress; he need not show it was a necessary condition."). Later, when evidence is presented, the employer can rebut a *prima facie* showing of causation by proving that it "would have reached the same result even without the protected speech." *Peele*, 722 F.3d at 960. In other words, "***In the end***,

15

the plaintiff must demonstrate that, but for his protected speech, the employer would not have taken the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) (emphasis added). But we are far from the proof stage, and McCarragher's pleadings suffice to plausibly allege that political favoritism was "a motivating factor" or "sufficient condition." *See id.*

Third, there is no requirement that a plaintiff specifically plead suspicious timing. Suspicious timing is a type of circumstantial evidence that can be used to *prove* retaliatory motive, one of the possible "bits and pieces" of evidence suggestive of a retaliatory motive. *See Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). It is not a required element of a claim. And in any event, without discovery, it is premature to conclude that the timing of Ditton's decisions was definitively benign. Ditton's citation to materials outside the record, *see e.g.*, Group Ex. B, ECF No. 32-1, is not well-taken at the motion-to-dismiss stage. *See Doss v. Clearwater Title Co.*, 551 F.3d 634, 639 (7th Cir. 2008). Even if the court could take judicial notice of the substance of public records regarding the Township budget, without any explanation from Ditton those exhibits do not establish, as a matter of law, that there is nothing suspicious about the timing of Ditton's decisions, or that he lacked a retaliatory motive.

Here, the plaintiff alleges in Count II that after this lawsuit was filed, Ditton hired back his unqualified political allies and not McCarragher, despite her superior qualifications and the existence of an open position (albeit one that differed from her prior position, being part-time instead of full-time). Instead, Ditton hired another of his supporters, the sister of his campaign manager, for the open position. Moreover, Ditton ultimately invited McCarragher to interview for the open position, but only after McCarragher had filed a Sur-reply brief in this case on Ditton's motion to dismiss the original complaint; that Sur-reply disclosed that a position was open and might have induced Ditton to try to improve his litigation position by reaching out to

16

McCarragher. Moreover, by way of context, the failure to recall McCarragher occurred after another alleged First Amendment violation—her termination based on her political allegiances. From these factual allegations, if true, one could infer a retaliatory motive.

### III. Qualified Immunity

Finally, Ditton argues that even if he violated McCarragher's First Amendment rights in some fashion, he is protected from liability by the doctrine of qualified immunity. The defense applies if "taken in the light most favorable to the plaintiff, the facts . . . show the official violated a constitutional right" and "the right was clearly established at the time of the alleged violation." *Vose v. Kliment*, 506 F.3d 565, 568 (7th Cir. 2007). Ditton says that the defense applies here because, as a matter of law, he was entitled to "hire and fire employees in the Assessor's Office as he sees fit . . . and can rely on party affiliation and personal loyalty" in doing so—in other words, he argues that based on the amended complaint's allegations, no constitutional violation occurred. Mem. 15, ECF No. 32. This Court finds it inappropriate to dismiss the complaint on this ground at this time.

"[T]he rule that qualified immunity must be resolved at the earliest possible stage . . . must be tempered by the notice pleading requirements of Rule 8." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) (internal citations omitted). In fact, the Seventh Circuit has gone as far as saying that "dismissal at the pleading stage is inappropriate" insofar as the defense depends on the facts of the case. *Alvarado v. Litscher*, 267 F.3d 648, 651–52 (7th Cir. 2001). Still, the appellate court has allowed dismissal based on qualified immunity, such as when the facts alleged could not possibility add up to a constitutional violation, *see Vose*, 506 F.3d at 572, or when it is plain that no "clearly established" law applies to the defendant's alleged actions, *see Chasensky v. Walker*, 740 F.3d 1088, 1097 (7th Cir. 2014). Neither is the case here.

Ditton's argument rests on the premise that McCarragher's position inherently involved policymaking authority and that she could therefore be terminated based on her political allegiances. Thus this is a case where disputed facts matter to the determination of whether a constitutional violation occurred (the prong of the qualified-immunity inquiry on which Ditton's argument is based). The parties hotly dispute whether McCarragher had policymaking authority, making the applicability of the exception a question that cannot be resolved on these pleadings. Plus it is only the plaintiff's version of the facts that matter at the pleadings stage, so the Court must assume that McCarragher's position did not entail policy-making, that Ditton only had to lay her off because he had been keeping unqualified patronage hires on the payroll, and that he did not rehire her because of her political disloyalty to him. On the basis of these allegations, the Court has already concluded that there is a plausible First Amendment claim stated in the amended complaint; therefore, Ditton cannot establish the first prong of the qualified-immunity inquiry at this time. *See generally Levenstein v. Salafsky*, 164 F.3d 345, 351 (7th Cir. 1998) (first prong not met where claim of constitutional violation survived motion to dismiss).

Nor can this Court say that as a matter of law, there was no clearly established law applicable to this situation. Regarding Count I, the Seventh Circuit has already held that, for purposes of qualified immunity, there is a clearly established right of public employees not to be penalized by their employer for exercising their First Amendment speech rights. *See Delgado v. Jones*, 282 F.3d 511, 520 (7th Cir. 2002). It is difficult to imagine that another First Amendment right applicable to public employees—the right of free association—would be viewed differently. The *Elrod-Branti* line of cases is long and straightforward, and therefore the right to be free from adverse employment action based upon political allegiances is well-established as a general proposition. If the particular facts of this case turn out to present a situation that falls

outside the general rule, then Ditton can reassert the qualified-immunity defense to Count I. As for Count II, the Seventh Circuit has squarely held that the right to be free from negative employment consequences as a result of exercising First Amendment rights, such as filing a lawsuit,[7] is one that is clearly established. *See Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 648 (7th Cir. 2013) (collecting cases). Accordingly this Court cannot accept the qualified-immunity defense at the pleading stage.

*       *       *

Ditton's motion to dismiss is denied because the allegations in the amended complaint, taken as true, add up to a plausible claim that Ditton violated McCarragher's First Amendment rights by taking her political allegiances into account in making hiring and firing decisions. Furthermore, the defense of qualified immunity is asserted prematurely given a contested set of facts and a line of case law that could (although the Court makes no ruling now) lead to the conclusion that a clearly established right was violated once the facts are developed.

Date: May 19, 2017

John J. Tharp, Jr.
United States District Judge

---

[7] To enjoy First Amendment protection, the lawsuit must pertain to a matter of public concern. *See Borough of Duryea, Pa. v. Guarnieri,* 564 U.S. 379, 398 (2011); *Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 925 (7th Cir. 2007). Unlawful political patronage by public employers fits this description.

19